**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Lloyd Ray PICHE, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellant,**

**v.**

**Lloyd Ray PICHE, Defendant–Appellee.**

**Nos. 91–5692, 91–5705.**

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1992.

Decided Nov. 25, 1992.

Mary Elizabeth Manton, Federal Public Defender, Raleigh, NC, argued for defendant-appellant.

Leslie A. Simon, U.S. Dept. of Justice, Washington, DC, argued (John R. Dunne, Asst. Atty. Gen., David O. Simon, Acting Deputy Asst. Atty. Gen., Dennis J. Dimsey, U.S. Dept. of Justice, on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

OPINION

ERVIN, Chief Judge:

Lloyd Ray Piche (Lloyd) and his brother Robert Piche (Robert) harassed a group of seven Asian–American men at a Raleigh, North Carolina bar. Robert, with Lloyd's participation, killed one of the men, Ming Hai "Jim" Loo, by hitting him in the head with a pistol. Robert was convicted in state court of second degree murder and assault with a deadly weapon and sentenced to 37 years' imprisonment. Lloyd was convicted of misdemeanor assault and sentenced to six months' imprisonment; he actually served one and a half months.

The government prosecuted Lloyd alone in federal court. Lloyd was convicted in the Eastern District of North Carolina on eight counts of violating 18 U.S.C. 241 (conspiring to injure, oppress, threaten and intimidate the Asian–American men, with death resulting) and 18 U.S.C. §§ 2 and 245(b)(2)(F) (intimidating and interfering with the Asian–American men because of their race, color or national origin and because they were enjoying the goods and services of a public facility). The district court sentenced Lloyd to 48 months' imprisonment by downwardly departing from the sentencing guidelines to equalize Lloyd's federal and Robert's state sentence. In addition, the court imposed a $28,000 restitutionary fine upon Lloyd. Lloyd appeals his conviction and sentence on various grounds, and the government cross-appeals the downward departure. We affirm Lloyd's conviction. We vacate his sentence, however, because the district court failed to make sufficient findings regarding Lloyd's ability to pay the restitution award and improperly departed from the guidelines.

I.

On the night of July 28, 1989, Jim Loo and six other Asian–American men—Chi Cuong "Jim" Ta, Lanh Tang, Tai Trong Le, Thai Nguyen "Teo" Ton, Minh Van Lam, and Hong Thanh Nguyen—were playing pool at the Cue 'N Spirits, a bar/poolroom in Raleigh. Lloyd, drinking heavily but still coherent, was at the Cue 'N Spirits

with his brother Robert and a third man. Lloyd approached the group of men and challenged them to play pool for money. The men declined the offer.

Thereafter, Lloyd and his brother began harassing the men by calling them derogatory racial names, making threatening gestures, and challenging them to fight. Lloyd, who did most of the talking, and Robert called the men such names as "slanty eyed gooks" and "black pajamas" (J.A. 89), "gooks" and "rice eaters" (J.A. 151), and "chinks" (J.A. 173). The brothers said that they hated the Vietnamese because their brother had been killed in Vietnam, and that the Vietnamese should never have come to America. Lloyd threatened the men by making kung fu gestures and pretending to fire a machine gun at them. At one point, Lloyd confronted Lanh Tang by laying his arm on Tang's and then telling Tang to take his arm off. After Tang removed his arm and walked away, Lloyd followed him and said that he hated Vietnamese people and wanted to fight the men and "finish [them] off." J.A. 109–110. With Robert standing behind him, Lloyd said that they would meet the men outside in the parking lot and that the men would have to go outside sooner or later.

Lloyd also confronted Tai Trong Le and Teo Nguyen Ton, whom he recognized from an earlier encounter at the Korner Pocket, another Raleigh bar/poolroom. On that occasion, Lloyd and a friend harassed a mixed group of ten Asian–Americans and Caucasians, calling them racially derogatory names, threatening them, and eventually pursuing them into the parking lot. Lloyd said to Le, "Before you guys were ten of you guys on two of us and tonight it's six of you guys and three of us, we can finish it tonight." J.A. 174.

At one point, Lloyd went up to Steven Ecklard, another bar patron, and said, "When the shit goes down remember what color you are," which Ecklard interpreted as an attempt to recruit him to help the Piches in the upcoming fight. J.A. 152–53. Myron Owens, who was playing pool at a nearby table, also recognized that something was going to happen and offered to help the Asian–American men if necessary.

Throughout the harassment, the victims remained quiet and attempted to avoid or ignore the Piches. After some time, Hong Nguyen and Jim Loo went to the bar area to buy a beer and make a phone call, respectively. Lloyd began yelling at Loo. While Lloyd pointed his finger in Loo's face, Robert wrapped his belt around his fist with the buckle dangling and told Loo to step outside. Lloyd said at this time to a Caucasian bar patron, Cyrus Bailey, that "if anybody walked behind his brother, any nigger, any chink, he'd cut their head off." J.A. 318.

The bartender at this point sent everyone outside. Robert pushed Loo outside, and Lloyd, along with Tang and Ta, went out at the same time. Lloyd continued to "run[ ] his mouth." J.A. 319. Robert went into the trunk of his car and took out a shotgun. He attempted to hit Tang with it, swinging the gun like a baseball bat. Tang managed to slip away. Jim Ta and Lanh Tang testified that Lloyd came up behind Tang and held his head against the car so that Robert could hit him, but Tang slipped away again and the shotgun fell to the ground and broke. Robert then returned to his car and pulled out a pistol. Lloyd was standing near the entrance to the bar, apparently to guard it. At this point, Cyrus Bailey, who had also come outside, went back into the bar. Lloyd briefly followed Bailey through the door, pushed him in the back of the head and said, "If you didn't want trouble why did you come outside," and then came back outside. J.A. 321–23.

Robert pointed the pistol at Tang. Tang ran, and Robert headed toward Loo, who was standing near the entrance to the bar. Robert swung the pistol at Loo, hitting him on the left side of his head around the eye. Loo fell immediately to the ground, bleeding heavily from his face. When a police officer arrived soon afterwards, Lloyd told Robert to run away. Robert did run, but was eventually caught and arrested.

When bystanders attempted to help Loo, Lloyd became upset, told them to let Loo

up, and gestured with a clenched fist. When Lloyd was sitting on a bench close to where Loo was lying, bystanders saw Lloyd smiling, laughing, making sarcastic remarks, and saying that the victim "deserved this." J.A. 287. Lloyd later told a police officer and others that Loo hit himself with a bottle, and that no one had hit Loo.

Loo was taken to the hospital, where he never regained consciousness. He died two days later from brain injuries. It is not clear whether these injuries were caused by the pistol blow or by Loo's having fallen on a piece of glass after being hit.

## II.

Lloyd first contends that the district court's instruction on "death resulting" constituted reversible error. The offense charged in count one, 18 U.S.C. § 241, applies:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State ... in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....
>
> They shall be fined not more than $10,-000 or imprisoned not more than ten years, or both; *and if death results,* they shall be subject to imprisonment for any term of years or for life.

18 U.S.C. § 241 (1992) (emphasis added). Count three, 18 U.S.C. § 245(b)(2)(F), violations include a similar "death resulting" penalty provision. *See* 18 U.S.C. § 245(b)(5) (1992).

The district court instructed the jury on the "death resulting" provision as follows:

> The fifth and final essential element that the United States must prove is that the defendant's actions resulted in the death of Ming Hai Loo, also known as Jim Loo. In order for you to find the defendant guilty as to this portion of count one, you must find that Ming Hai Loo's death was a natural and foreseeable consequence of

the acts committed by the defendant or a co-conspirator.

> It is not necessary for the United States to prove that the defendant intended Mr. Loo to die as a result of his actions. Nor need the United States prove that the defendant struck the blow that directly caused Mr. Loo's death. "If death results" does not mean "if death was intended" or "directly caused by the defendant." Rather, the statute is designed to deter the type of conduct that creates an unacceptable risk of loss of life.

> If you find that the defendant willfully engaged in a conspiracy, that the defendant or a co-conspirator committed acts during the course of the conspiracy which resulted in the victim's death, and the death was a natural and foreseeable result of the acts, then you may find that this final element has been established.

J.A. 776–77. The court's instructions with respect to count three were substantially identical as to this element. *See* J.A. 786–87.

Lloyd does not contest the court's statement that the phrase "if death results" requires only that death foreseeably and naturally, rather than directly and intentionally, result from the rights-violating conduct, for that is clearly the law of this circuit. *See United States v. Harris,* 701 F.2d 1095, 1101 (4th Cir.), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983). Lloyd does object to the court's statement that "the statute is designed to deter the type of conduct that creates an unacceptable risk of loss of life." Lloyd argues that this statement, in combination with certain comments by the prosecutors, caused the jurors to make an example of Lloyd by convicting him whether he was guilty or not in order to deter racial crimes in society at large.

 First, we note that the court's statement of the statute's purpose is a correct statement of existing law. *See United States v. Hayes,* 589 F.2d 811, 821 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Guillette,* 547 F.2d 743, 749 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98

S.Ct. 132, 54 L.Ed.2d 102 (1977). Second, even if, read alone, this sentence could be considered a license for the jury to view Lloyd's case with society's larger problems in mind, there can be no reversible error if, viewing the charge as a whole, it fairly and adequately states the law pertinent to this case. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *United States v. Cobb,* 905 F.2d 784, 788–89 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991). The district court has considerable discretion in choosing the specific wording of instructions. *United States v. Garcia,* 562 F.2d 411, 416 (7th Cir.1977). The court in this case charged the jury that "it is also your duty to base your verdict solely upon the testimony and evidence in the case, without prejudice or sympathy." J.A. 760. In addition, the court charged that to convict Lloyd the jury must be convinced beyond a reasonable doubt that Lloyd knowingly and willfully participated in a conspiracy to injure or intimidate the victims in the exercise of their civil rights. *See* J.A. 768–76. Read in context with the rest of the instruction, the court's sentence about deterrence does not allow the jury to convict Lloyd simply in order to deter dangerous conduct if he is not personally guilty of each element of the offense. Lloyd's challenge to this instruction therefore fails.

### III.

At trial, Lloyd's counsel attempted to cross-examine one of the victims, Lanh Tang, about a previous racial incident. Tang testified out of the presence of the jury that, in the spring of 1989, he left his high school in Raleigh ostensibly to sign up for courses at North Carolina State University (N.C. State). Rather than, or perhaps in addition to, going to N.C. State, Tang went to another high school with four other Asian Americans, including co-victim and witness in the case at bar, Jim Ta. Tang had heard that there would be a fight at this school against several African–Ameri-

can high school students. Tang testified that he was not involved in the fight itself.

The government objected that questioning about this incident before the jury would be irrelevant. In response, Lloyd's counsel stated, "I believe that the evidence would be admissible, your honor, because [the government] has repeatedly introduced character evidence in terms of Asian Americans...." J.A. 134. The court sustained the government's objection to this line of questioning, although it did not spell out its reasons for doing so.

### A.

■ Although Lloyd did not make this argument below, he claims before this court that the questioned evidence was relevant to showing that Tang (and Ta) previously had participated in racial violence and, by implication, willingly did so in this instance as well. The district court was well within its discretion to disallow the testimony on these grounds.

In general, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion...." Fed.R.Evid. 404(a).[1] In claiming that the proffered testimony was relevant to making an assessment of Tang's character, Lloyd contends before this court that he was attempting to admit the evidence under the exception to Rule 404(a), Fed.R.Evid. 405(b). Rule 405 establishes the permissible methods of proving character:

(a) **Reputation or Opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense,

1. Lloyd does not argue before this court, nor did he argue below, that the evidence should have been admitted under Fed.R.Evid. 404(b) to

show motive, intent, plan, identity or absence of mistake or accident.

proof may also be made of specific instances of that person's conduct.

Fed.R.Evid. 405. Evidence of specific instances of conduct is the most convincing of Rule 405's three methods of proving character, but it also "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." Rule 405 advisory committee's Note. Thus, the Rule confines this type of evidence to instances in which character is in issue "in the strict sense," *id.*, which occurs where " 'a material fact that under the substantive law determines rights and liabilities of the parties,' " such as plaintiff's reputation for honesty in a defamation action. *Perrin v. Anderson*, 784 F.2d 1040, 1045 & n. 4 (10th Cir.1986) (quoting *McCormick on Evidence* § 187, at 551 (3d ed. 1984)).

For the sake of argument, we assume that Lloyd could introduce evidence about Tang's character. Because the evidence of character that Lloyd attempts to admit is not an essential element of a charge, claim, or defense, however, proof of character is limited to reputation or opinion evidence in accord with Rule 405(a). *See United States v. Gravely*, 840 F.2d 1156, 1164 (4th Cir.1988) (testimony of specific activities with March of Dimes inadmissible to show good character); *Tyler v. White*, 811 F.2d 1204, 1206 & n. 2 (8th Cir.1987) (in civil rights action by prisoner, district court properly disallowed guard from bringing in "character evidence" that prisoner carried brass knuckles and thus was probably the aggressor; even if character evidence were

admissible, it would have to be in form of opinion or reputation evidence, not specific instances of conduct). Lloyd cannot, therefore, prove character, as he attempts to do, through a specific example of past conduct, even if character evidence were admissible.[2]

### B.

■ Lloyd argues before us, in the alternative, that the proffered testimony would show that Tang would lie (say that he was going to N.C. State and instead attend the fight) to further his racial group's goals, and thus the evidence should be admissible to impeach Tang's credibility under Fed. R.Evid. 608.

Lloyd attempted to have evidence admitted but did not specifically identify this ground below. We have not had occasion to determine the standard of review applicable to this assignment of error. It would appear from Fed.R.Evid. 103 that a party must identify the specific ground of the objection only where the court's ruling admitted evidence, while the party need only make the substance of the evidence known to the court if the ruling is to exclude the evidence.[3] In this case, Lloyd attempted to introduce the evidence and thus, under a plain reading of Rule 103, we should review his objection under an abuse of discretion standard. However, at least three circuits hold that a party desiring to admit evidence over the court's ruling to the contrary must also state each specific ground on which

---

**2.** Lloyd relies on *Perrin*, 784 F.2d at 1045, in which the court held that evidence that a plaintiff in a civil rights suit became violent whenever he saw uniformed policemen was admissible. However, the court disallowed use of the evidence of specific instances of conduct under Rule 405 because the defendant desired to prove that the plaintiff acted in conformity with the character trait, which is not allowed. The *Perrin* court did allow admission of the numerous violent instances as evidence of habit, where the Rule 405 restrictions do not apply. *Id.* at 1046. In no way, however, can the one instance of conduct that is in issue here constitute proper habit evidence. *See Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 511 (4th Cir.1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978).

**3.** According to Rule 103:

(a) **Effect of erroneous ruling.**—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) **Objection.**—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
(2) **Offer of proof.**—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked....
(d) **Plain error.**—Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

the evidence is admissible or the court of appeals will review each ground raised for the first time on appeal only on a plain error standard. *See Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1421 (5th Cir.1986); *United States v. Edwards*, 696 F.2d 1277, 1281 (11th Cir.), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); *Huff v. White Motor Corp.*, 609 F.2d 286, 290 n. 2 (7th Cir.1979). Lloyd's challenge is unsuccessful even under the standard of review more favorable to him, the abuse of discretion standard, so we need not choose between the two standards in this case.

According to Rule 608:

(b) **Specific Instances of Conduct.**—Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. ...

Fed.R.Evid. 608. This rule was specifically worded to emphasize the discretionary power of the trial judge to admit or exclude evidence under it. *See* 10 *Moore's Federal Practice* § 608.21, at VI–90 (2d ed. 1988); Report on Rule 608 by the House Committee on the Judiciary. Rule 608(b) was in fact amended to ensure that it would be restrictively interpreted by district courts. *See* 3 Jack B. Weinstein and Margaret Berger, *Weinstein's Evidence* Para. 608[05], at 608–47 (1991).

In this case, it was not clear from Lloyd's proffer or even Tang's testimony that Tang affirmatively lied. He may have gone to N.C. State that day to register, since he did matriculate the next year. Even if Tang did lie that day, this one episode of lying does not bear on his credibility at Lloyd's

trial so clearly that it would be an abuse of discretion for the district court to exclude reference to it. *See Cloud v. Thomas*, 627 F.2d 742, 744–45 (5th Cir.1980) (no requirement to admit evidence that witness lied before to show that he may therefore have lied at trial), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981). *Cf. United States v. Beros*, 833 F.2d 455, 463–64 (3rd Cir.1987) (approving of district court's admittance of credibility evidence that defendant lied about his marital status in a sworn statement "given the magnitude of his attempted falsehood.").[4]

## C.

■ Lloyd's strongest argument is that the court's limitation on the scope of Tang's cross-examination violated Lloyd's right to confront the witnesses testifying against him in violation of the Sixth Amendment and the Federal Rules of Evidence. Lloyd's contention is that the proffered testimony is probative of Tang's bias as a member of a *de facto* Asian gang engaged in conflict with members of other races, and that this fact furnished him with a motive to lie in order to harm Lloyd.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him," and this right is not necessarily coextensive with the Federal Rules. *Cloud v. Thomas*, 627 F.2d 742, 745 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981). The " 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940) (emphasis deleted)). "Exposure of a witness' motivation in testifying is a proper and important func-

---

**4.** Lloyd's citation to *United States v. Schatzle*, 901 F.2d 252, 255–56 (2d Cir.1990), hurts rather than helps his case. In *Schatzle*, the district court allowed inquiry into a witness' false statement on a bar application as relevant to his capacity for truthfulness, but this admission was not challenged on appeal. The *Schatzle* court specifically upheld the district court's de-

cision not to allow investigation into the specific altercation with a police officer that was the basis of the false statement, since this "posed a genuine risk of focusing the jury upon the wrong event." *Id.* at 256. The district court in the case at bar could legitimately have come to the same conclusion.

tion of the constitutionally protected right of cross-examination." *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988).

Lloyd's most persuasive authorities concern a party's attempt to show that an opposing witness is biased because the witness is a member of a gang. *See United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (impeachment of defense's witness for bias by showing that he and defendant were members of Aryan Nation, whose tenets included lying and killing for each other, held permissible under Federal Rules of Evidence even though no rule specifically allows it); *Clark v. O'Leary*, 852 F.2d 999, 1006 (7th Cir.1988) (Confrontation Clause case; overturning district court's exclusion of evidence that victims were members of a gang that was a rival of the defendants' gang, because this inter-gang animosity provided evidence that the victims lied about the identity of their assailants).

■ Discussing the Federal Rules of Evidence in *Abel*, the Supreme Court stated that proof of bias is almost always relevant because it bears on the truth of a witness' testimony. The Court also stated that a witness' and party's common membership in such an organization is certainly probative of bias. 469 U.S. at 52, 105 S.Ct. at 469. However, according to the Court:

> A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403....

*Id.* at 54, 105 S.Ct. at 470. Even though the Federal Rules and the Confrontation Clause are not necessarily coextensive, courts consider the same basic factors under each. As the Supreme Court has stated regarding the Confrontation Clause:

It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.[5]

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *see also United States v. Bodden*, 736 F.2d 142, 145 (4th Cir.1984) (right to confrontation "not so broad as to deprive the district court of all discretion in limiting needless or confusing inquiry into collateral matters").

The district court in this case legitimately sustained the government's objection to admission of the evidence under the Federal Rules and the Confrontation Clause. This testimony concerned a fight between a group of Asian–Americans and a group of African–Americans that bore no relation to the defendants or the events in question. The court could properly have determined, contrary to Lloyd's present theory, that Tang's and Ta's alleged participation with other Asian–Americans in a fight against certain African–American students did not necessarily make them members of an Asian gang. In addition, even if Tang and Ta were to be considered members of a gang whose rivals were certain African–American students, that fact did not make them rivals against Caucasians in general, much less against these defendants. Therefore, the district court did not abuse its discretion in performing the task ascribed to it by the Supreme Court of "[a]ssessing the probative value of common membership in any particular group." *Abel*, 469 U.S. at 54, 105 S.Ct. at 470. Finally, because there was no evidence whatsoever that the Asians were in any

---

5. This litany supersedes this court's more limited list of possible reasons not to allow impeachment under the Confrontation Clause, as stated in *Hoover v. State of Maryland*, 714 F.2d 301, 305 (4th Cir.1983).

sense the aggressors against the Piches, the district court could properly have concluded that evidence of Tang's attendance at the high school fight against African–Americans would unfairly prejudice the government's case by misleading the jury and confusing the issues. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *Abel,* 469 U.S. at 54, 105 S.Ct. at 470.

In sum, the district court did not abuse its discretion in omitting the testimony since "the relevance of such questions was unclear and the risk of prejudice was real." *United States v. Sellers,* 658 F.2d 230, 232 (4th Cir.1981) (per curiam). We therefore find no error in the court's exclusion of Tang's testimony.

## IV.

■ Lloyd contends that the district court's jury instructions on an element of every count in the indictment, whether Cue 'N Spirits was a place of public accommodation within the meaning of the statute, constituted a directed verdict on this element in favor of the government in violation of the Sixth Amendment.

■ Lloyd is correct that the United States Constitution requires that the jury, in a criminal case, determine beyond a reasonable doubt that the government has proven each element necessary to constitute the crime charged. Thus, a judge in a criminal case may not direct a verdict, even a partial verdict, for the government even though the evidence is overwhelming or even undisputed on the point. *See United States v. Martin Linen Supply Co.,* 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977); *United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988). When a judge gives an instruction preventing the jury from considering a material issue, that instruction is equivalent to an impermissible directed verdict on the issue. *See Hoover v. Garfield Heights Mun. Court,* 802 F.2d 168, 177 (6th Cir.1986), *cert. denied,* 480 U.S. 949, 107 S.Ct. 1610, 94 L.Ed.2d 796 (1987).

The district court instructed the jury on the public accommodation element as follows:

A place of public accommodation is any establishment that is used by members of the general public for entertainment, that is, recreation, fun, or pleasure, and in which the sources of entertainment move in interstate commerce.

It is the duty of the court and not the jury to determine whether the government's evidence, if you believe it beyond a reasonable doubt, established that the Cue 'N Spirits was a place of public accommodation. In other words, with respect to the public accommodation aspect of the indictment, you need only to decide whether the witnesses who testified regarding this issue were credible to the extent that you believe their testimony beyond a reasonable doubt.

You have heard various witnesses testify about the Cue 'N Spirits, the games, and other equipment located in the facility, and the activities performed by the customers. You have also heard that the games, other equipment and alcoholic beverages were manufactured out-of-state. If you believe such witnesses beyond a reasonable doubt, then I instruct you that the evidence in this case meets the requirements of the law and you may find that the Cue 'N Spirits is a place of public accommodation.

J.A. 773.

The court in this case did not direct a verdict for the government, and Lloyd's cited cases[6] are inapposite. The instructions in the cited cases preempted factual determinations that only the jury could make. In this case, the court left the question whether the government proved that Cue 'N Spirits was a place of public accommodation for the jury alone to determine. By stating that *if* the jury believed the government's evidence on the public accommodation issue, *then* the government proved the public accommodation element,

---

**6.** *See, e.g., Kerley,* 838 F.2d at 937; *United States v. White Horse,* 807 F.2d 1426 (8th Cir.1986); *United States v. Voss,* 787 F.2d 393 (8th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986).

the court merely stated the legal conclusion that would necessarily follow from the jury's finding. Because the instruction left the factual issue for the jury, the court committed no error. *See United States v. Kuta,* 518 F.2d 947, 952 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *see also United States v. Curcio,* 759 F.2d 237, 242 (2d Cir.), *cert. denied,* 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 117 (1985).

## V.

 Lloyd argues that the evidence was insufficient, as a matter of law, to sustain his conviction of conspiracy under 18 U.S.C. § 241. On appellate review of sufficiency challenges,

> [t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt. We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established.

*United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982) (citations omitted). To sustain the conspiracy conviction, the government must first show that a conspiracy to commit the crime existed. A conspiracy is an agreement between two or more individuals to commit a criminal act. *Morrison v. California,* 291 U.S. 82, 92, 54 S.Ct. 281, 285, 78 L.Ed. 664 (1934). This agreement may be inferred from the facts and circumstances of the case. The government must also show the alleged conspirator's knowledge of the conspiracy's purpose and some voluntary and intentional action indicating his participation. "These elements, knowledge and participation, may also be proven by circumstantial evidence." *United States v. Laughman,* 618 F.2d 1067, 1074–75 (4th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).

There was clearly sufficient evidence to implicate Lloyd in a conspiracy involving his brother to deprive the Asian–American patrons of the bar of their civil rights. The evidence demonstrates circumstantially that Lloyd voluntarily entered into an agreement with his brother to injure, oppress, threaten and intimidate the Asian–American men, with death resulting. While Lloyd did not strike the blow that killed Loo, such a showing is not necessary in order to prove Lloyd guilty of the conspiracy. The evidence demonstrated that Lloyd initiated both brothers' attempts to intimidate and threaten the group of Asian–American men, who did nothing to provoke the Piches' acts of racial hostility. Both brothers called the men racially derogatory names. Lloyd pretended to shoot them, said that he and his brother were going to "finish [them] off" (J.A. 110), and for the men to meet them outside. Lloyd told Caucasians at the bar that they should join with the Piches against the Vietnamese once the fight began, and, according to two witnesses, actually held Tang's head while Robert attempted to hit him with a shotgun. After Robert hit Loo with the pistol, Lloyd told his brother to run away and lied to the police that no one had hit Loo. Accordingly, we reject Lloyd's sufficiency argument.

## VI.

 Lloyd contends that the district court violated the Victim and Witness Protection Act of 1982 (VWPA) by failing to consider his ability to pay the $28,000 restitution order. The court must consider, in determining whether to order restitution under the VWPA:

> the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a). The VWPA thus "implicitly requires the district judge to balance the victim's interest in compensation against the financial resources and circum-

stances of the defendant." *United States v. Bruchey,* 810 F.2d 456, 458 (4th Cir. 1987). The district court must "make clear findings of fact on the defendant's resources, and the financial needs and earning ability of the defendant." *Id.* at 459. We review restitution orders under an abuse of discretion standard. *Id.* at 458.

■■■ The requirement that a district court consider the defendant's financial circumstances in ordering restitution does not preclude a judge from ordering an indigent defendant to pay restitution. However, as we recently held, "the court must make a factual determination that the defendant can feasibly comply with the order without undue hardship to himself or his dependents." *United States v. Bailey,* 975 F.2d 1028, 1032 (4th Cir.1992).

In this case, the court awarded Loo's family $28,008.91 in restitution from Lloyd. The court ordered that Lloyd begin his payments during incarceration and pay the remaining portion while under supervised release. The court adopted the factual findings in the presentence report, according to which Lloyd had assets totalling $1.04 and no current liabilities. He irregularly held jobs paying minimum wage, although one short-term job paid $11 an hour; when arrested, Lloyd was working occasionally as a temporary laborer. The report concluded that Lloyd did not have the ability to pay a fine. The schedule of restitution payments must be completed within five years after the date of sentencing, 18 U.S.C. § 3663(f)(2)(B). Therefore, assuming that Lloyd would be unable to pay any sums while in prison (where he apparently will earn 11 cents an hour), the probation officer would require payments from Lloyd of at least $470 a month upon Lloyd's release.

Lloyd objected to the restitution order on the ground that it did not adequately take into account his financial ability to pay the award.

The court responded, in its only consideration of Lloyd's ability to pay:

Well, if he—that's under supervised release—he'll earn something while he's in prison. He can make some there. When

he gets out it's going to depend on what his employment is. And if there's a problem at that time—it's something he's going to have to try to pay, that's all there is to it, and I suspect he probably can.

J.A. 871.

We hold that the district court has not made adequate factual findings to support such a large restitution award in light of Lloyd's lack of assets, limited earning ability, and imprisonment during part of the time in which he is expected to pay the award. *See United States v. Sharp,* 927 F.2d 170, 174 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 139, 116 L.Ed.2d 106 (1991). The court nowhere finds that $28,-000 is feasible in light of Lloyd's financial condition or earning power. In fact, the court seems to find otherwise when it stated that "[t]he court does not impose a fine in this case due to the amount of restitution that it will hereinafter impose." J.A. 869. *See Sharp,* 927 F.2d at 174–75 (court's stated reason for not ordering fines, that defendants lacked the financial ability to pay them in light of the court's restitution order, made evident that "there may be reason to be concerned about their ability to pay" the ordered restitution). While we do not hold that the district court is necessarily unable to make findings that would justify the award, the court has not made such findings. Thus, we vacate the restitution award and remand for further consideration of the restitution order in accord with this opinion.

## VII.

The government cross-appeals the district court's decision to downwardly depart from Lloyd's guideline sentence by two years so that it would equal what the court determined would be Robert's actual sentence in the state system. Robert received a 37–year state sentence for second degree murder and assault with a deadly weapon, and his tentative parole eligibility date is April 10, 1993. The district court determined that Robert would serve approximately four years, assuming good behavior in prison.

A district court may depart from the guidelines only if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). In reviewing departures, we must determine whether the sentence was imposed in violation of law or as a result of an incorrect application of the guidelines. 18 U.S.C. § 3742(f)(1). If so, we must remand for resentencing. *See Williams v. United States*, — U.S. —, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). We use a standard akin to *de novo* review when reviewing this initial determination. *See United States v. Summers*, 893 F.2d 63, 66 (4th Cir.1990).

The court departed because it determined that there were two mitigating factors that the Commission had not adequately considered. The court's first reason to depart was to provide the government with an incentive to prosecute all co-conspirators in federal court, rather than selecting some for federal prosecution and allowing others to be sentenced only in state court. The district court maintained that such a governmental course is necessary in order to allow the federal court to sentence the co-conspirators commensurately. The court's second reason, as it stated in its memorandum opinion, was to eliminate the "grossly disparate and unfair sentencing of similarly situated defendants guilty of the *same* federal offense." J.A. 879.

The court's first reason for departing is unlawful. Although "[s]electivity in the enforcement of criminal laws is, of course, subject to constitutional constraints," "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124–25, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755 (1979); *see also United States v. Stanley*, 928 F.2d 575, 580–81 (2d Cir.) (when "the prosecutor declines to bring a charge at all ... he is creating a 'disparity' between the sen-

tences imposed on different defendants. And he undoubtedly has the authority to do so."), *cert. denied*, — U.S. —, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). The Supreme Court has approved the Justice Department's general policy of prosecuting in federal court one who has already been prosecuted in state court only where "necessary to advance compelling interests of federal law enforcement." *See Rinaldi v. United States*, 434 U.S. 22, 28–29, 98 S.Ct. 81, 85, 54 L.Ed.2d 207 (1977). Because there is no suggestion that the government in this case acted with constitutionally improper motive, its charging decisions are unreviewable. In addition, the court's second departure justification is also unlawful. The guidelines were created in order to create sentencing uniformity among defendants nationally, "even at the temporary cost of some apparent disparity in the sentencing of coconspirators in an individual case." *United States v. Kant*, 946 F.2d 267, 270 n. 3 (4th Cir.1991). To depart downward when a co-defendant receives a shorter state sentence would exacerbate national sentencing disparities in a manner not intended by the Commission. *See United States v. Vilchez*, 967 F.2d 1351, 1355 (9th Cir.1992). Furthermore, such a departure, based on the fortuity of the course taken by a co-defendant's prosecution, is not based on any level of culpability of the defendant himself. As the Seventh Circuit aptly stated in a different context, "the claim that someone else may not be punished severely enough is not a good objection to one's own punishment." *United States v. Marshall*, 908 F.2d 1312, 1321 (7th Cir.1990) (en banc), *aff'd sub nom.*, — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). As a result of these concerns, we recently held that, "absent proof of actual prosecutorial misconduct, ... a district court may not depart downward based upon the disparity of sentences among co-defendants." *United States v. Ellis*, 975 F.2d 1061, 1066 (4th Cir.1992). Because that is precisely what the court did in this case, we remand this case to the district

court for resentencing in accord with this opinion.[7]

## VIII.

For the aforementioned reasons, we affirm Lloyd's convictions. We vacate his sentence because the district court failed to make necessary findings concerning its award of restitution and because the court unlawfully departed downward from the guidelines.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

**7.** In his brief, Lloyd also appeals the district court's determination of his offense level under the guidelines. Lloyd specifically argues that the court should have classified the assault of Loo as a minor assault, not an aggravated assault; the court should not have enhanced Lloyd's sentence by finding that the assault involved the use of a dangerous weapon and permanent or life-threatening bodily injury; and the court erred by not reducing Lloyd's sentence because his role was minimal. Upon careful consideration, we reject these arguments.