30 F.3d 131
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillip Charles BROWN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Isaac BAYLIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Mark BROWN, a/k/a Melvin Williams, Defendant-Appellant.
 Nos. 92-5511, 92-5654, 93-5005.
 United States Court of Appeals, Fourth Circuit.
 Argued: Feb. 11, 1994.
Decided: July 22, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge. (CR-91-250-HM)
 Argued: Arcangelo M. Tuminelli, Baltimore, MD; Mark Anthony Kozlowski, Baltimore, MD, for appellants.
 Christine Manuelian, Asst. U.S. Atty., Baltimore, MD, for appellee.
 On brief: Lynne A. Battaglia, U.S. Atty. Baltimore, MD, for appellant.
 D.Md.
 AFFIRMED.
 Before HALL and MICHAEL, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants Phillip Charles Brown ("P.C. Brown"), Robert Mark Brown ("R.M. Brown"), and Isaac Baylis ("Baylis") were jointly tried and convicted of various crimes with respect to their roles in a triform conspiracy involving the illegal distribution of Dilaudid tablets.[1] Three principal issues are presented on appeal. The first issue is whether the Sentencing Commission exceeded its statutory authority by adopting a gross weight approach to calculate offense levels for drug offenders pursuant to United States Sentencing Commission, Guidelines Manual, Sec. 2D1.1. At the sentencing hearing of R.M. Brown, the district court determined that the Sentencing Commission acted in accordance with its congressional authority by utilizing the gross weight of narcotics to calculate offense levels.
 
 
 2
 The second issue is whether P.C. Brown's Sixth Amendment right to confrontation was abridged when the trial court limited his cross-examination of a Government witness. During trial the district court limited P.C. Brown's cross-examination of a Government witness because such cross-examination would unduly prejudice a co-defendant under Federal Rules of Evidence 403 and 404(b). The final related issue is whether P.C. Brown's motion to sever should have been granted to allow him an opportunity to further cross-examine the same Government witness. The district court denied P.C. Brown's motion to sever. We now affirm on each of the issues raised in this appeal.
 
 I.
 
 3
 From 1988 to January 1991, P.C. Brown organized and commanded a "script" scheme whereby forged prescriptions were used to obtain Dilaudid tablets from Maryland, Virginia, and Washington, D.C., pharmacies for resale to street dealers. P.C. Brown and his co-conspirators instituted phony drug rehabilitation programs to facilitate the prescription ring's narcotics activities. These businesses were manipulated by the ring to rent cars and electronic beepers and to provide a basis for having prescription pads printed.
 
 
 4
 The prescriptions, or "scripts," used by the ring contained information that would otherwise appear to be legitimate: the name of a practicing physician, a current physician registration number or Drug Enforcement Agency ("DEA") number, and the designation of a medical practice limited to oncology or cancer treatment. However, the address of the physician or medical office which appeared on the script did not correspond to the registered location of the practice. Further, the telephone numbers on the scripts were to public telephones located in area train stations or airports. When a pharmacist called to verify the information contained on the script, a co-conspirator stationed at a public telephone would answer "Doctor's Office" or "Medical Center" and give an appropriate response to authenticate the prescription.
 
 
 5
 To implement the plan, three or four members would accompany P.C. Brown each day to pharmacies selected by him to pass the fraudulent scripts. Constant beeper contact was maintained with other members standing by to verify the information. Working in shifts, the co-conspirators accompanied P.C. Brown to Washington, D.C., where they would sell the Dilaudid tablets for a profit of $12 to $20 per tablet. The evidence established that during the course of the conspiracy the prescription ring obtained and distributed an amount of Dilaudid equal to three (3) to ten (10) kilograms of heroin.
 
 
 6
 Appellants were indicted in the District of Maryland on three conspiracy counts and other related substantive charges.[2] After a lengthy trial, P.C. Brown and Baylis were convicted of the three conspiracy counts. The jury found R.M. Brown guilty of several of the substantive counts, but reached no decision as to the three conspiracy counts. R.M. Brown subsequently entered a guilty plea to Count One and was sentenced accordingly.
 
 
 7
 P.C. Brown was sentenced by the district court to 240 months on Count One and 48 months on each of Counts Two and Three, with all sentences to run consecutively. Baylis was sentenced to 188 months on Count One and 48 months on each of Counts Two and Three, with all sentences to run concurrently. Pursuant to his guilty plea, R.M. Brown was sentenced to 120 months on Count One and 48 months as to each of four substantive counts, with all sentences to run concurrently. For sentencing purposes, the district court applied the gross weight of the Dilaudid tablets involved in the scheme to determine Appellants' offense levels.
 
 II.
 
 8
 Appellant R.M. Brown[3] argues that the district court erred in applying the gross weight of the four (4) milligram Dilaudid tablets, rather than the net weight of the pure Dilaudid, to calculate his offense level as set forth in U.S.S.G. Sec. 2D1.1 and 21 U.S.C.Sec. 841(b)(1). R.M. Brown concedes that the language of Sec. 841(b)(1), and thus section 2D1.1, is clear and unambiguous and does not violate due process. See Chapman v. United States, 500 U.S. 453, 461-68 (1991) (statute requiring gross weight of "mixture or substance containing a detectable amount" of illegal substances to be used in calculating offense level does not violate due process and is not unconstitutionally vague); United States v. Whitehead, 849 F.2d 849, 860 (4th Cir.) (holding that Sec. 841(b)(1) is "rationally related to its goal of sentencing criminals involved in the upper echelons of drug distribution more heavily than those less importantly involved"), cert. denied, 488 U.S. 983 (1988); United States v. Daly, 883 F.2d 313, 318 (4th Cir.1989) (language of statute and sentencing guideline is "clear on its face" in requiring the gross weight of LSD and any carrier medium to determine offense level), cert. denied, 496 U.S. 927 (1990); United States v. Meitinger, 901 F.2d 27, 29 (4th Cir.1990) (holding gross weight determination applicable to Dilaudid), cert. denied, 498 U.S. 985 (1990).
 
 
 9
 Acknowledging the clear precedents in this area, R.M. Brown contends that he is making a first impression challenge to the gross weight calculation. He maintains that U.S.S.G. Sec. 2D1.1, as applied to pharmaceutical drugs such as Dilaudid, violates the Sentencing Commission's statutory mandates to provide certainty and fairness in sentencing, 28 U.S.C. Sec. 991(b)(1)(B) and id. Sec. 994(f), to alleviate unwarranted disparity in sentencing, id., and to promote respect for the law and just punishment, id. Sec. 991(b)(1)(A) and 18 U.S.C. Sec. 3553(a)(2)(A). Simply stated, R.M. Brown advocates that U.S.S.G. Sec. 2D1.1 is an unenforceable guideline.
 
 
 10
 In support of this argument, R.M. Brown cites some rather compelling, however unauthenticated, statistical data.[4] The conclusion drawn from that data is that a liquid form of Dilaudid, such as cough syrup, contains only a minuscule amount of active narcotic, whereas the tablet form of Dilaudid contains a much higher quantity of pure hydromorphone. Thus, according to the gross weight approach, the person possessing the lesser amount of active narcotic will be sentenced to a greater mandatory minimum. R.M. Brown contends that this result violates the goals of the Sentencing Commission as set forth in its enabling statute.
 
 
 11
 While R.M. Brown's contention is logically alluring, there is no foundation for such an argument in the statutes which we are bound to uphold. Section 2D1.1 of the Sentencing Guidelines merely tracks the language of the Anti-Drug Abuse Act, 21 U.S.C.Sec. 841(b)(1), which has been upheld repeatedly by the Fourth Circuit and the Supreme Court. The footnote to section 2D1.1 reads in pertinent part:
 
 
 12
 Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.
 
 
 13
 U.S.S.G. Sec. 2D1.1 n. * (1992) (emphasis added). The first application note to section 2D1.1 further clarifies thata 'mixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. Sec. 841, except as expressly provided." Id. Sec. 2D1.1 applic. n. 1.
 
 
 14
 Section 841(b)(1) of Title 21 of the United States Code reads in pertinent part:
 
 
 15
 (b) Penalties
 
 
 16
 Except as otherwise provided in section 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
 
 
 17
 (1)(A) In the case of a violation of subsection (a) involving--
 
 
 18
 (i) 1 kilogram or more of a mixture or substance containing a detectable amount of heroin;
 
 
 19
 ...
 
 
 20
 such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life....
 
 
 21
 21 U.S.C. Sec. 841(b)(1)(A) (Supp.1990). The language "mixture or substance containing a detectable amount" references the gross weight of the illegal substance and its carrier medium. Therefore, Congress unambiguously stated in Sec. 841(b)(1) that the weight of the pure narcotic and its carrier medium should be combined to determine the sentences of drug offenders. Section 2D1.1 cannot be said to violate any congressional purpose when the provision mimics the very language of the substantive criminal offense.[5]
 
 
 22
 Moreover, despite R.M. Brown's statistical data, there is no indication that the sentencing scheme of section 2D1.1 has failed to support the goal of punishing more severely those individuals who deal in larger amounts of drugs. The Supreme Court aptly articulated this reality in Chapman:
 
 
 23
 While hypothetical cases can be imagined involving very heavy carriers and very little LSD, those cases are of no import in considering a claim by persons such as petitioners, who used a standard LSD carrier. Blotter paper seems to be the carrier of choice, and the vast majority of cases will therefore do exactly what the sentencing scheme was designed to do--punish more heavily those who deal in larger amounts of drugs.
 
 
 24
 Chapman, 500 U.S. at 466. Likewise, tablets, and not cough syrup, are the carriers of choice for Dilaudid dealers. Drug traffickers choose their own medium. A system which punishes the choice to deal in illegal substances is not unfair solely because a factor in sentencing is the weight of the medium used to disguise the drug.
 
 
 25
 In summary, we hold that section 2D1.1, like 21 U.S.C. Sec. 841(b)(1), is clear and unambiguous and does not violate the purposes and goals of the Sentencing Commission as set forth in the Commission's enabling statute.[6]
 
 III.
 
 26
 Appellant P.C. Brown argues that his Sixth Amendment right to confront the witnesses against him was violated when he was not permitted to cross-examine a Government witness, Frank Palmer, regarding the circumstances surrounding Palmer's prior conviction for insurance fraud. P.C. Brown contends that Palmer's veracity, credibility, and motive for testifying were at issue during Palmer's cross-examination.
 
 
 27
 Palmer testified on direct examination that he owned a printing business and that he was approached by P.C. Brown to have letterhead, envelopes, and business cards printed for a drug detoxification center. During the course of their business relationship, Palmer began printing prescription pads for doctors he was told worked for the detoxification center. Palmer also testified that he believed P.C. Brown was a legitimate businessman. On cross-examination, the following information was elicited: (1) Palmer misstated dates surrounding his business dealings with P.C. Brown, inconsistent with previous grand jury testimony; (2) Palmer testified that records of his sales to Brown were discarded by his employees by mistake or destroyed by flood; (3) Palmer admitted to having been in business with a known drug dealer; and (4) Palmer admitted to having printed prescription pads, without requesting any verification, for an undercover DEA agent.
 
 
 28
 After having placed Palmer's credibility in jeopardy, P.C. Brown sought to show that Palmer had a motive for testifying against him--namely, that P.C. Brown had caused Palmer's conviction for insurance fraud.[7] When P.C. Brown attempted to elicit the circumstances surrounding Palmer's conviction, co-defendant Wilbur Vinson objected on the grounds that it was improper and prejudicial 404(b) evidence. The Government agreed. P.C. Brown, however, indicated that he offered the evidence to impeach Palmer's credibility regarding his statement that he thought Brown was a legitimate businessman and to show his motivation for fabricating the truth against Brown. After hearing arguments, the district court found that the evidence would be highly prejudicial to both P.C. Brown and Vinson. We agree.
 
 
 29
 "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam ). The Fourth Circuit has adhered to a similar principle:
 
 
 30
 [T]he right is not so broad "as to deprive the district court of all discretion in limiting needless or confusing inquiry into collateral matters." In exercising that discretion, the trial judge may appropriately consider whether the proposed cross-examination would unfairly prejudice a co-defendant.
 
 
 31
 United States v. Bodden, 736 F.2d 142, 145 (4th Cir.1984) (citations omitted). See generally United States v. Piche, 981 F.2d 706 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2356, 124 L.Ed.2d 264 (1993); United States v. Crockett, 813 F.2d 1310 (4th Cir.), cert. denied, 484 U.S. 834 (1987). These cases make clear that the Sixth Amendment in no way mandates open-ended cross-examination and that the scope of cross-examination rests within the sound discretion of the trial judge.
 
 
 32
 However, Supreme Court jurisprudence also warns that limitations placed on cross-examination by a defendant should be carefully scrutinized. See, e.g., Davis v. Alaska, 415 U.S. 308, 315-19 (1974) (confrontation clause violated where defendant not allowed to explore witness' motivation to cooperate with police for fear of being accused of the crime because of witness' past juvenile record and where witness is crucial to the prosecution); Delaware v. Van Arsdall, 475 U.S. 673, 680-84 (1986) (confrontation clause violated where defendant not allowed to explore charges that were dropped against witness when witness agreed to come forward and testify against defendant).
 
 
 33
 The facts of the present case are not as compelling as those in Davis or Van Arsdall. First, Palmer had been convicted for insurance fraud prior to the charges against P.C. Brown unlike the situations in Davis and Van Arsdall where charges were pending or imminent. Second, Palmer was not critical to the Government's case, and his credibility could not have altered the outcome of the trial. The Government called Palmer as a witness only to show the source of the prescription pads, not to show that they were fraudulent. The Government called doctors and handwriting experts to testify that the prescriptions were fraudulent. Finally, the defense managed to damage Palmer's credibility without the circumstances surrounding the insurance fraud. The jury had evidence before it that Palmer had been under investigation by state and federal agents, that he associated with drug dealers, that critical documents had disappeared suspiciously, and that he had been convicted of insurance fraud. Evidence concerning the circumstances of Palmer's conviction for insurance fraud would have been merely cumulative. Therefore, we find no error to the district court's termination of the cross-examination of Palmer concerning the circumstances of his conviction for insurance fraud.
 
 IV.
 
 34
 Finally, P.C. Brown argues that the district court abused its discretion when it denied his motion to sever so that he might cross-examine Palmer concerning the details of Palmer's conviction for insurance fraud.
 
 
 35
 A motion to sever remains within the sound discretion of the trial judge. There is a preference in the federal system for joint trials of defendants who are indicted together. As such, the Supreme Court has recently rearticulated the standard for when severance is allowable:
 
 
 36
 We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.
 
 
 37
 Zafiro v. United States, --- U.S. ----, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993) (emphasis added).
 
 
 38
 In this case, Defendant P.C. Brown's motion was made on the tenth day of a complicated four-week trial of multiple defendants. Moreover, the motion was based upon P.C. Brown's Sixth Amendment right to cross-examine Palmer concerning the insurance fraud scheme. Having found there was no Sixth Amendment violation, and, therefore, no denial of a specific trial right, we now affirm the district court's denial of P.C. Brown's motion to sever.[8]
 
 V.
 
 39
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 Dilaudid is the trade name for the pharmaceutical drug known as hydromorphone, a Schedule II controlled substance. It is a highly addictive painkiller used primarily with cancer patients. Dilaudid tablets are also used illegally as a substitute for heroin
 
 
 [2]
 Count One of the Indictment charged a violation of 21 U.S.C. Secs. 846 and 841(a)(1), unlawful conspiracy to distribute and possess with intent to distribute "a quantity of a mixture or substance containing a detectable amount of hydromorphone [Dilaudid]." (Indictment at 2.) Count Two alleged a violation of 21 U.S.C. Secs. 846 and 843(a)(2), unlawful conspiracy to use registration numbers for the purpose of obtaining Dilaudid. (Indictment at 23.) Count Three charged a conspiracy to obtain possession of Dilaudid by misrepresentation or fraud in violation of 21 U.S.C. Secs. 846 and 843(a)(3). (Indictment at 24.) The remainder of the nineteen count Indictment charged various co-conspirators with related substantive offenses
 
 
 [3]
 The Government contends that the other Appellants cannot join R.M. Brown in this argument because they did not raise the issue at sentencing. However, the Government ultimately agrees the issue is relevant to all Appellants. Because we now affirm the district court, the question of whether P.C. Brown and Baylis may raise the issue on appeal is moot
 
 
 [4]
 The calculations presented by R.M. Brown are as follows:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 Active NarcoticGross WeightOffense Level Dilaudid19.67 grams120,000 grams42 Cough Syrup(819 bottles) Dilaudid19.67 grams442.6 grams32 Tablets(4,918 tablets)
 
 
 [5]
 While there is some legislative history to suggest that Senators Biden and Kennedy attempted to amend the gross weight calculation in Sec. 841(b), the fact remains that the amendment never passed. See Daly, 883 F.2d at 316-18; Chapman, 500 U.S. at 471-73 (Stevens, J. dissenting). Thus, the current law remains clear that the gross weight is the proper calculation
 
 
 [6]
 We are not alone in our analysis that the enabling statute of the Sentencing Commission does not necessarily control the substance of the Sentencing Guidelines. See United States v. Davern, 937 F.2d 1041 (6th Cir.1991), vacated, 970 F.2d 1490 (6th Cir.1992) (en banc ), cert. denied, --- U.S. ----, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). Davern involved the calculation of the amount of the drug used for sentencing purposes: the amount actually possessed versus the negotiated amount. A divided panel of the Sixth Circuit accepted an argument that the sequence of sentencing steps advocated by the Sentencing Commission violated the "just punishment" goal set forth in the Sentencing Commission's enabling statute at 18 U.S.C. Sec. 3553(a)(2). Davern, 937 F.2d at 1051. As a result, that first panel found that the offense level is simply a proposal from which the court can depart for "aggravating or mitigating circumstances" as determined in light of sentencing goals. Id. at 1045
 The Sixth Circuit, sitting en banc, vacated the panel opinion finding that the calculation of offense level was a sentencing imperative, not a mere proposal, thus rejecting the defendant's argument that the enabling statute should prevail. 970 F.2d at 1492. The court stated that departure provisions which considered certain sentencing goals were to be used only after the appropriate sentencing calculations had been made. Id. Thus, while the enabling statute represents the overall goals and purposes of the Sentencing Commission, the guidelines are the imperatives which district courts must follow.
 
 
 [7]
 Through counsel, it was established that Palmer had fallen behind in making certain payments, needed money, and wished to sell his van to pay his debt. P.C. Brown suggested to Palmer that he knew how to handle the situation. P.C. Brown and co-defendant Wilbur Vinson subsequently picked up the van, the van disappeared, and Palmer filed a false stolen vehicle report. Palmer was, of course, apprehended
 
 
 [8]
 The court has received numerous papers from P.C. Brown complaining, inter alia, of physical and mental impairments as well as misconduct on the part of the prosecuting attorney. Having reviewed each of those papers, the court does not find them to be relevant to or helpful in its determination